FILED
2014 Mar-05  AM 10:21
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### EASTERN DIVISION

| | | |
|---|---|---|
| **JAMES R. KING,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No.: 1:12-CV-1715-VEH** |
| | ) | |
| **CVS CAREMARK** | ) | |
| **CORPORATION, a/k/a CVS** | ) | |
| **PHARMACY, and CODY** | ) | |
| **BERGUSON,** | ) | |
| | ) | |
| **Defendants.** | ) | |

---

## MEMORANDUM OPINION AND ORDER

## I.     INTRODUCTION

### A.     Summary of Mr. King's Claims

Plaintiff James R. King ("Mr. King") initiated this job discrimination lawsuit against Defendants CVS Caremark Corporation ("CVS") and Cody Berguson ("Mr. Berguson") arising under federal and Alabama law on April 27, 2012. (Doc. 1). On December 12, 2012, Mr. King filed an amended complaint containing ten separate counts. (Doc. 19 at 17-26 ¶¶ 92-130). Count One contends that CVS violated the federal Age Discrimination in Employment Act ("ADEA") and the Alabama Age Discrimination in Employment Act ("AADEA") by discriminating against, harassing,

and creating a hostile work environment for Mr. King because of his age. (Doc. 19 at 17-19 ¶¶ 92-100).

Count Two asserts retaliation against CVS under the ADEA and the AADEA. (Doc. 19 at 19-20 ¶¶ 101-04). Count Three maintains that CVS discriminated against Mr. King on the basis of his gender in violation of Title VII. (*Id.* at 20-21 ¶¶ 104-09). Count Four alleges that CVS violated the Equal Pay Act. (Doc. 19 at 21-22 ¶¶ 110-13).

The remaining six counts all arise under Alabama law. Count Five is for libel and slander and is brought against both CVS and Mr. Berguson. (Doc. 19 at 22-23 ¶¶ 114-18). Count Six, which is also asserted against CVS and Mr. Berguson, is for defamation. (*Id.* at 23-24 ¶¶ 119-123). Count Seven is for negligent and wanton hiring, training, supervision, and retention, and is alleged against CVS only. (*Id.* at 24-26 ¶¶ 124-130).

Count Eight, brought jointly against CVS and Mr. Berguson, is for interference with contractual or business relations. (Doc. 19 at 26-27 ¶¶ 131-36). Count Nine is for invasion of privacy by both CVS and Mr. Berguson. (*Id.* at 28-29 ¶¶ 137-140). Finally, Count Ten, asserted against CVS and Mr. Berguson collectively, is for intentional infliction of emotional distress. (*Id.* at 29-30 ¶¶ 141-48). The court's foregoing summary of the claims contained in Mr. King's amended complaint is

consistent with the parties' briefing on summary judgment.

### B.   Summary of Pending Motions

#### 1.   Rule 56 Motions

Pending before the court are CVS's Motion for Summary Judgment (Doc. 45) ("CVS's Motion") and Mr. Berguson's Motion for Summary Judgment (Doc. 46) ("Mr. Berguson's Motion"), both of which were filed on August 21, 2013. CVS and Mr. Berguson jointly filed all their supporting materials on this same date. (Docs. 47, 48)[1]. Mr. King opposed these motions on November 27, 2013. (Docs. 56, 57).[2] On January 22, 2014, Defendants followed with their combined reply. (Doc. 60).[3]

#### 2.   Evidentiary Motions

Also pending before the court are three evidentiary motions. On December 3, 2013, Mr. King filed a Motion for Protective Order Pursuant to Fed. R. Civ. P. 37 to Exclude Any Testimony or Reference to the Testimony of Jeffrey A. Hardage (Doc. 58) (the "Hardage Strike Motion"). Defendants filed their opposition (Doc. 61) to the Hardage Strike Motion on January 22, 2014, and Mr. King replied (Doc. 65) on February 3, 2014.

---

[1] All page references to Doc. 47 correspond with the court's CM/ECF numbering system.

[2] All page references to Doc. 56 correspond with the court's CM/ECF numbering system.

[3] All page references to Doc. 60 correspond with the court's CM/ECF numbering system.

Defendants then objected to the admissibility of certain areas of testimony relied upon by Mr. King in two separate motions filed on January 22, 2014: (1) Objection to Admissibility of Portions of Affidavit and Supplemental Affidavit of Plaintiff James R. King and Motion to Strike (Doc. 62) (the "King Strike Motion"); and (2) Objection to Admissibility of Witness Statements and Motion to Strike (Doc. 63) (the "Non-Party Strike Motion"). Mr. King, on February 5, 2014, opposed these motions, respectively. (Docs. 66, 67). Defendants followed with their reply briefs on February 18, 2014. (Docs. 70, 69).

Accordingly, CVS's Rule 56 Motion, Mr. Berguson's Rule 56 Motion, the Hardage Strike Motion, the King Strike Motion, and the Non-Party Strike Motion are now all under submission. For the reasons explained below, CVS's Rule 56 Motion is **GRANTED IN PART** and **DENIED IN PART**, Mr. Berguson's Rule 56 Motion is **GRANTED IN PART** and **DENIED IN PART**, the Hardage Strike Motion is **TERMED** as **MOOT**, and the King Strike Motion and the Non-Party Strike Motion are **DENIED IN PART** and **TERMED** as **MOOT IN PART**.

## II.    FACTUAL BACKGROUND[4]

Mr. King is a former CVS pharmacist who worked at CVS's retail store located in Pell City, Alabama. CVS hired Mr. King on or about February 16, 2004, and ended his employment on or about October 11, 2011.

Beginning in 2006, Mr. Berguson became Mr. King's pharmacy supervisor. As a pharmacy supervisor, Mr. Berguson was responsible for overseeing approximately 60-80 pharmacists in his district comprising 23 pharmacies. Starting in late 2010, Mr. Berguson began to ask Mr. King questions such as "When are you going to retire?" or "Why don't you buy an annuity and retire?" (Doc. 57-1 at 3 ¶ 13).[5] According to Mr. King, "[t]he comments were numerous and were never precipitated by [him] in any conversation about [him] wanting to retire or work less hours." *Id.* Mr. King further maintains that "[i]t got to the point that every time [he] saw Berguson, he

---

[4]  Keeping in mind that when deciding a motion for summary judgment the court must view the evidence and all factual inferences in the light most favorable to the party opposing the motion, the court provides the following statement of facts. *See Optimum Techs., Inc. v. Henkel Consumer Adhesives, Inc.*, 496 F.3d 1231, 1241 (11th Cir. 2007) (observing that, in connection with summary judgment, a court must review all facts and inferences in a light most favorable to the non-moving party). This statement does not represent actual findings of fact. *See In re Celotex Corp.*, 487 F.3d 1320, 1328 (11th Cir. 2007). Instead, the court has provided this statement simply to place the court's legal analysis in the context of this particular case or controversy. Finally, due to the nature of this court's decision on summary judgment, the foregoing statement of facts is significantly limited in scope. In particular, due to the variety of claims that Mr. King has asserted, the court elects to develop many of the pivotal summary judgment facts as part of the applicable analyses of those claims.

[5]  All page references to Doc. 57-1 correspond with the court's CM/ECF numbering system.

made some age biased remark." *Id*.

Mr. Berguson was the supervisor who decided, or, at a minimum, was involved in the decision to suspend and subsequently terminate Mr. King's employment with CVS over a prescription refilling incident that occurred in September 2011.[6]

## III.  STANDARDS

### A.    Summary Judgment Generally

Summary judgment is proper only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R . Civ. P. 56(c). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the nonmovant. *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). "Once the moving party has properly supported its motion for

---

[6] The court acknowledges that there is conflicting evidence in the record about who actually made the decision to terminate Mr. King's employment. (*See, e.g.*, Doc. 53-18 at 3 at 9 ("Val Giunta made the decision to terminate."); *id.* ("I actually terminated Mr. King, but I didn't make the decision to terminate Mr. King.")). The court accepts, for summary judgment purposes, that Mr. Berguson either made the decision to fire Mr. King or alternatively was involved and had input with respect to that process. (*See id.* ("We discussed [during a conference call] the incident that occurred with the gross violation around the dispensing [by Mr. King] of the 90 hydrocodone a week prior."); *see also* Doc. 53-18 at 36 at 142 ("What I'm saying is he deserved an answer one way or the other, because he had been suspended at that point almost going on two weeks, and we needed to provide Mr. King an answer to how we were going to proceed.")). The first set of page references to Doc. 53-18 corresponds with the court's CM/ECF numbering system and the second set corresponds with the deposition transcript page(s).

summary judgment, the burden shifts to the nonmoving party to 'come forward with specific facts showing that there is a genuine issue for trial.'" *International Stamp Art, Inc. v. U.S. Postal Service*, 456 F.3d 1270, 1274 (11th Cir. 2006) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)).

Finally "[i]f the movant bears the burden of proof on an issue, because, as a defendant, it is asserting an affirmative defense, it must establish that there is no genuine issue of material fact as to any element of that defense." *International Stamp*, 456 F.3d at 1274 (citing *Martin v. Alamo Community College Dist.*, 353 F.3d 409, 412 (5th Cir. 2003)).

## B.   Employment Discrimination Generally

A plaintiff in an employment discrimination case maintains the ultimate burden of proving that the adverse employment decision was made because of intentional discrimination. *See Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 143, 120 S. Ct. 2097, 2106, 147 L. Ed. 2d 105 (2000) ("Although intermediate evidentiary burdens shift back and forth under this framework, '[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" (quoting *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S. Ct. 1089, 1093, 67 L. Ed. 2d 207 (1981))); *Nix v. WLCY Radio/Rahall Comms.*, 738 F.2d 1181, 1184 (11th Cir. 1984)

("A Title VII disparate treatment plaintiff must prove that the defendant acted with discriminatory purpose." (citing *Clark v. Huntsville City Board of Education*, 717 F.2d 525, 529 (11th Cir. 1983))).

Although the Supreme Court has established the basic allocation of burdens and order of proof in a disparate treatment case, *see, e.g.*, *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973); *Burdine*, *supra*; *Desert Palace v. Costa*, 539 U.S. 90, 123 S. Ct. 2148, 56 L. Ed. 2d 84 (2003), that framework applies only in cases in which there is no direct evidence of discrimination. *See Grigsby v. Reynolds Metals Co.*, 821 F.2d 590, 595 (11th Cir. 1987) ("The *McDonnell Douglas-Burdine* patterns of proof were designed to ease the evidentiary burdens on employment discrimin[a]tion plaintiffs, who rarely are fortunate enough to have access to direct evidence of intentional discrimination." (citing *Thornbrough v. Columbus and Greenville R.R.*, 760 F.2d 633, 638 (5th Cir. 1985), *abrogated on other grounds by St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 113 S. Ct. 2742, 125 L. Ed. 2d 40 (1993))[7].

---

[7] As the Eleventh Circuit has explained, "only the most blatant remarks, whose intent could be nothing other than to discriminate on the basis of age, . . . constitute direct evidence of discrimination." *Carter v. City of Miami*, 870 F.2d 578, 582 (11th Cir. 1989) (citing *Barnes v. Southwest Forest Industries, Inc.*, 814 F.2d 607, 610-11 (11th Cir. 1987)). Despite this demanding standard, Mr. King suggests that he has properly presented a direct evidence case of age discrimination. (Doc. 56 at 52-54). Alternatively, Mr. King relies upon the circumstantial evidence model. (*See, e.g., id.* at 55 ("These facts, along with the multitude of additional facts set forth in the Material Facts portion of this memorandum, are sufficient to establish a *prima facie* case of age

Under the *McDonnell Douglas/Burdine* scheme, a plaintiff first has the burden of proving by a preponderance of evidence a *prima facie* case of discrimination. Second, once the plaintiff proves a *prima facie* case, the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its employment decision. Finally, if the defendant carries its burden, the plaintiff must *either* prove by a preponderance of the evidence that the legitimate reasons offered by the defendant are merely a pretext for discrimination *or* present sufficient evidence, of any type, for a reasonable jury to conclude that discrimination was a "motivating factor" for the employment action, even though the defendant's legitimate reason may also be true or have played some role in the decision. *McDonnell Douglas*, 411 U.S. at 802-05, 93 S. Ct. at 1824-26; *Burdine*, 450 U.S. at 252-54, 101 S. Ct. at 1093-94; *Desert Palace*, 539 U.S. at 101-02, 123 S. Ct. at 2155.

## C.   Age Discrimination

### 1.   ADEA

Most of Mr. King's federal claims arise under the ADEA. The ADEA provides that "[i]t shall be unlawful for an employer . . . to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his [or her] compensation, terms, conditions, or privileges of employment, because of such

---

discrimination.")).

individual's age." 29 U.S.C. § 623(a)(1). In order to fall under the ADEA's protections, an employee must be "at least 40 years of age[,]" 29 U.S.C. § 631(a), and the plaintiff "retains the burden of persuasion to establish that age was the '<u>but-for</u>' cause of the employer's adverse action."[8] *Gross v. FBL Financial Services, Inc.*, 557 U.S. 167, 177, 129 S. Ct. 2343, 2351, 174 L. Ed. 2d 119 (2009) (emphasis added).

The Eleventh Circuit "has adopted a variation" of the *prima facie* case standard articulated by the Supreme Court for Title VII claims in *McDonnell Douglas* for cases arising under the ADEA. *Mitchell v. Worldwide Underwriters Ins. Co.*, 967 F.2d 565, 566 (11th Cir. 1992). "Under this variation of the *McDonnell Douglas* test for establishing a *prima facie* case of discrimination, the plaintiff must show that he (1) was a member of the protected group of persons between the ages of 40 and 70, (2) was subject to adverse employment action, (3) was replaced with [or not selected for a position over] a person outside the protected group, and (4) was qualified to do the job." *Mitchell*, 967 F.2d at 566 (citing *Verbraeken v. Westinghouse Elec. Corp.*, 881 F.2d 1041, 1045 (11th Cir. 1989)); *see also Standard v. A.B.E.L. Services, Inc.*, 161 F.3d 1318, 1333 (11th Cir. 1998) ("To establish his *prima facie* case of discriminatory failure to promote, Standard must show that (1) he was in a protected

---

[8] In contrast to the <u>motivating factor</u> standard that is applicable in some types of Title VII lawsuits.

group; (2) he was not given the promotion; (3) he was qualified for the position and (4) someone outside of the protected group was given the position." (citing *Coutu v. Martin County Bd. of County Commissioners*, 47 F.3d 1068, 1073 (11th Cir. 1995))).

"If this is done, the defendant has the burden of going forward and articulating a legitimate, non-discriminatory rationale for the [adverse employment action]." *Verbraeken*, 881 F.2d at 1045. "Finally, if the defendant rebuts the presumption of discrimination, the plaintiff must prove by a preponderance of the evidence that the employer's asserted reason is merely a pretext for a discriminatory [action]." *Id.*

### 2.   AADEA

Mr. King also asserts violations of the AADEA. Claims arising under the AADEA are analyzed according to the same framework as the ADEA. *See Robinson v. Alabama Cent. Credit Union*, 964 So. 2d 1225, 1228 (Ala. 2007) ("[T]he federal courts have applied to AADEA claims the same evidentiary framework applied to federal age-discrimination claims."); *id.* (citations omitted) ("We agree that this framework . . . is the proper means by which to review an AADEA claim.").

### C.   Evidentiary Rulings

"All evidentiary decisions are reviewed under an abuse-of-discretion standard." *See, e.g., General Elec. Co. v. Joiner*, 522 U.S. 136, 141 (1997). "An abuse of discretion can occur where the district court applies the wrong law, follows the wrong

procedure, bases its decision on clearly erroneous facts, or commits a clear error in judgment." *United States v. Estelan*, 156 Fed. App'x 185, 196 (11th Cir. 2005) (citing *United States v. Brown*, 415 F.3d 1257, 1266 (11th Cir. 2005)).

Moreover, as the Eleventh Circuit has made clear, not every incorrect evidentiary ruling constitutes reversible error:

> Auto-Owners' second argument is that it is entitled to a new trial on the basis of what it describes as a number of erroneous evidentiary rulings by the district court. Evidentiary rulings are also reviewed under an abuse of discretion standard. *Finch v. City of Vernon*, 877 F.2d 1497, 1504 (11th Cir. 1989). Moreover, even if Auto-Owners can show that certain errors were committed, the errors must have affected "substantial rights" in order to provide the basis for a new trial. *See* Fed. R. Evid. 103(a). "Error in the admission or exclusion of evidence is harmless if it does not affect the substantial rights of the parties." *Perry*, 734 F.2d at 1446. *See also Allstate Insurance Co. v. James*, 845 F.2d 315, 319 (11th Cir. 1988).

*Haygood v. Auto-Owners Ins. Co.*, 995 F.2d 1512, 1515 (11th Cir. 1993). Therefore, even the existence of many evidentiary errors does not guarantee an appealing party relief from an adverse final judgment. Instead, such erroneous rulings by a district court must "affect the substantial rights of the parties" in order for reversible error to occur.

IV.    ANALYSIS

    A.    **Rule 56 Motions**

        1.    **Uncontested Claims**

In his opposition, Mr. King has abandoned his Title VII gender discrimination and Equal Pay Act counts. (Doc. 56 at 2 n.2). Therefore, CVS's Rule 56 Motion is **GRANTED** on Counts Three and Four of Mr. King's amended complaint as uncontested by him.

        2.    **Contested Claims**

           **Federal Claims**[9]

        a.    **Count One for Age Discrimination**
              **and Harassment/Hostile Work**
              **Environment**

Count One of Mr. King's amended complaint consists of two types of claims, *i.e.*, age discrimination and age harassment/hostile work environment, which, by

---

[9] Another former employee of CVS named Roger D. Harris ("Mr. Harris") filed a job discrimination lawsuit against CVS on February 22, 2011. (Doc. 1 in 1:11-CV-732-VEH (the "*Harris* action")). In that case, Mr. Harris brought many of the same federal claims that Mr. King has asserted and is still pursuing in his case. On January 29, 2013, the court entered a memorandum opinion and order in the *Harris* action which granted summary judgment in favor of CVS on Mr. Harris's claims for ADEA retaliation and hostile work environment, but denied summary judgment on Mr. Harris's ADEA discrimination claim. (Docs. 57, 58). While the undersigned certainly is not bound to follow that prior decision entered in the *Harris* action when evaluating the merits of Mr. King's ADEA-related claims under Rule 56, due to the similarity of both lawsuits' evidentiary and legal underpinnings, the court can (and does) elect to adopt that ruling's framework and disposition as persuasive authority in support of its treatment of Mr. King's federal claims.

virtue of the jurisdiction section of his pleading (Doc. 19 at 1 ¶¶ 1.a, 1.b), Mr. King brings under both the ADEA and the AADEA. As the framework for evaluating the merits of an AADEA claim mirrors that used for ADEA actions, the court addresses all of his age-related claims as if Mr. King has asserted each one as arising under the ADEA only.

### (1)    Age Discrimination

### <u>Direct Evidence</u>

Relying upon Mr. Berguson's barrage of questions to Mr. King about when he planned to retire, Mr. King contends that he has direct evidence of age discrimination. (Doc. 56 at 52-54). The court disagrees.

Mr. Berguson's retirement-related comments do not rise to the level of direct evidence with respect to the decision to discharge Mr. King. *See Burrell v. Bd. of Trs. of Ga. Military Coll.*, 125 F.3d 1390, 1393 (11th Cir. 1997) ("Here, we cannot say that Baggarly's statement-even if fully credited- proves the existence of a discriminatory motive in his decision to terminate Plaintiff's employment; at best, the evidence *suggests*-but does not prove-a discriminatory motive."). While from this evidence a reasonable jury could perhaps <u>infer</u> age-bias on the part of Mr. Berguson in ending Mr. King's employment with CVS, direct evidence is a caliber of proof "which if believed, proves existence of fact in issue <u>without inference or</u>

14

presumption." *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1528 n. 6 (11th Cir. 1987)

(emphasis added) (citing *Black's Law Dictionary* 413 (5th ed. 1979)).

## Circumstantial Evidence

Guided by its prior summary judgment decisions in the *Harris* action, the court

finds that Mr. King has adduced sufficient evidence from which a reasonable jury

could circumstantially conclude that he was impermissibly discharged on the basis

of his age. CVS does not in any manner challenge Mr. King's *prima facie* case of age

discrimination. (*See* Doc. 47 at 39 ("Assuming Plaintiff can establish a *prima facie*

case . . . .")). Instead, the sole focus of CVS's Rule 56 Motion as to this claim is that

Mr. King cannot establish pretext with respect to its explanation for firing him: Mr.

King violated CVS's policy involving controlled drug losses and Alabama Pharmacy

Board Regulations. (Doc. 47 at 39).

As for its explanation behind the dismissal decision, CVS states that Mr. King

improperly:

> [D]irected a pharmacy tech to force-dispense 90 Lortab (Hydrocodone)
> pills out of the ScriptPro machine so they were not linked in any way in
> the CVS computer system to patient Ms. Jones or to a valid prescription
> for her; directed Mr. Jones to the store's stockroom door area located
> outside of the pharmacy at the rear of the store; secreted the vial of the
> 90 Lortab (Hydrocodone) pills into his pocket as he walked over to meet
> Mr. Jones; gave Mr. Jones the 90 Lortab pills without a valid
> prescription; failed to charge him for the narcotics and failed to ring up
> the transaction in the cash register so there would be a record of
> payment being made for the Schedule III medication; failed to have Mr.

Jones sign a signature log documenting that Mr. Jones took possession of the controlled substances; and failed to report the loss or theft of the original Lortab fill.

(Doc. 47 at 39-40).

As this court has previously stated regarding pretext in the *Harris* action:

> The means by which a plaintiff can call an employer's articulated reason into doubt are particularly relevant here. First, a plaintiff may offer comments from the decision maker which betray a discriminatory animus. *See Beaver v. Rayonier, Inc.*, 200 F.3d 723, 729–730 (11th Cir. 1999). The strength of the inference which may be drawn from such comments is determined by their substance, timing, and context. *See Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1363 n.3 (11th Cir. 1999). It logically follows that comments which are directed at a particular employee and which relate to the employment decision at issue warrant a stronger inference than stray remarks wholly unrelated to the employee or employment action. Additionally, comments by the decision maker, which would not by themselves establish pretext, can establish pretext when combined with other evidence of discrimination. *See Beaver*, 200 F.3d at 729–730. Finally, the Eleventh Circuit has said that, when an employer fires an employee for violating a "work rule," the employer's reason "is arguably pretextual when a plaintiff submits evidence (1) that [he] did not violate the cited work rule, or (2) that if [he] did violate the rule, other employees outside the protected class, who engaged in similar acts, were not similarly treated." *Damon*, 196 F.3d at 1363. Regardless of the evidence presented, the plaintiff always bears the ultimate burden of persuasion. *See Damon*, 196 F.3d at 1363 n.3.

(Doc. 58 in 1:11-CV-732-VEH  at 14-15).

Here, Mr. King has adduced evidence from which a reasonable jury could conclude that Mr. Berguson held an age-related bias based upon his retirement-related questions repeatedly directed to Mr. King. "Even whe[n] such evidence of [age] bias

proves insufficient to prove an employee's case through direct evidence, it can be relevant in the circumstantial framework to show that the employer's proffered reasons were pretextual." *Vessels v. Atlanta Independent School System*, 408 F.3d 763, 771 (11th Cir. 2005) (citing *Ross v. Rhodes Furniture*, 146 F.3d 1286, 1291 (11th Cir. 1998)).

In addition to the age-based comments directed towards him, Mr. King points out that Mr. Berguson treated another older pharmacist, Roger Harris ("Mr. Harris"), the plaintiff in the *Harris* action, similarly. Although Mr. Harris did not work at the Pell City CVS store, Mr. Berguson did supervise him. According to Mr. Harris, Mr. Berguson would ask him how old he was, inquire when he was going to retire, and refer to him as "old man." (Doc. 57-4 at 11 ¶ 15).[10]

Mr. King also has demonstrated inconsistencies in Mr. Berguson's handling of Mr. King's suspension and subsequent discharge. *See Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997) ("The district court must evaluate whether the plaintiff has demonstrated 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence.'" (quoting *Sheridan v. E.I. DuPont de Nemours and Co.*, 100 F.3d 1061,

---

[10]  All page references to Doc. 57-4 correspond with the court's CM/ECF numbering system.

1072 (3d Cir. 1996))). More specifically, Mr. Berguson initially told Mr. King that he was suspended pending a review of his conduct by the Alabama Pharmacy Board. However, even though the record lacks any proof that the Alabama Pharmacy Board concluded, after its investigation, that Mr. King had engaged in any wrongdoing from its standpoint, CVS nevertheless still terminated Mr. King's employment.[11]

The foregoing evidence is sufficient to create a triable issue regarding pretext on Mr. King's discriminatory discharge claim. In sum, the record contains "'evidence of such quality and weight that reasonable and fairminded men in the exercise of impartial judgment might reach different conclusions.'" *See MacPherson v. University of Montevallo*, 922 F.2d 766, 776 (11th Cir. 1991) (quoting *Verbraeken v. Westinghouse Elec. Corp.*, 881 F.2d 1041,1045 (11th Cir. 1998)). More particularly, as to pretext, "[t]he evidence presented by plaintiff[] is sufficient to allow a jury in the exercise of impartial judgment to conclude that [CVS's] proffered explanations are unworthy of belief." *MacPherson*, 922 F.2d at 776. Alternatively, a reasonable jury could equally conclude that CVS's articulated reasons for firing Mr. King are legitimate and not a pretext for discrimination under the ADEA. Therefore, summary judgment is **DENIED** on Mr. King's ADEA discriminatory discharge claim.

---

[11] In Mr. Berguson's second deposition, he testified that the decision to terminate Mr. King's employment was made on September 30, 2011, and that he "personally never head from the Board of Pharmacy at any time." (Doc. 53-18 at 35 at 139, 138).

### (2)    Hostile Work Environment

To establish a hostile work environment claim, a plaintiff must show: (1) that he belongs in a protected group, (2) that he was subjected to unwelcome harassment, (3) that the harassment was based on the protected characteristic, (4) that the harassment was sufficiently severe and pervasive to alter the terms and conditions of employment, and (5) a legal basis for holding the employer liable. *See Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1245 (11th Cir. 1999) (citation omitted).

The sufficiently severe and pervasive prong contains "a subjective and an objective component." *Id.* at 1246 (citation omitted). According to the Eleventh Circuit:

> [t]he employee must "subjectively perceive" the harassment as sufficiently severe and pervasive to alter the terms or conditions of employment, and this subjective perception must be objectively reasonable. The environment must be one that "a reasonable person would find hostile or abusive" and that "the victim . . . subjectively perceive[s] . . . to be abusive." Furthermore, "the objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances.'"

*Id.* (citation omitted).

The Supreme Court has identified four factors which guide the objective portion of this analysis: "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the

19

employee's job performance." *Id.* (citing to *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23, 114 S. Ct. 367, 371 (1997)). The Supreme Court has further established that severe harassment does not include sporadic jokes or off-handed comments directed toward a protected class. *See Faragher v. City of Boca Raton*, 524 U.S. 775, 788, 118 S. Ct. 2275, 2283–84 (1998).

Assuming without deciding that a hostile work environment claim is actionable under the ADEA,[12] and assuming without deciding that Mr. King's hostile work environment claim is timely under an application of the continuing violation doctrine, this claim still fails. In support of his harassment theory, Mr. King factually contends:

> In late 2010, Berguson began making age-based comments to me such as "when are you going to retire" or "why don't you buy an annuity and retire?" The comments were numerous and were never precipitated by in any conversation about my wanting to retire or work less hours. It got to the point that every time I saw Berguson, he made some age biased remark.

> I found these comments highly offensive and considered them to be inappropriate inquires and expressions of Berguson's position and belief that I retire due to my age.

> Defendants increased their harassing conduct after my 65th birthday.

(Doc. 57-1 at 3 ¶¶ 13-15).

---

[12] *See EEOC v. Massey Yardley Chrysler Plymouth, Inc.*,117 F.3d 1244, 1249 n.7 (11th Cir. 1997) ("Neither party questions, hence we do not actually decide, whether the hostile environment doctrine developed in Title VII actions applies in an ADEA action, a question so far decided specifically by only one circuit court of appeals, the Sixth.").

Accepting all of Mr. King's allegations as true, the record simply does not support Mr. King's claim that he endured severe and pervasive job-altering harassment by Mr. Berguson because of his age. At best, Mr. King has shown that Mr. Berguson made numerous non-threatening retirement-related comments to him beginning in late 2010 through his last day of employment on September 20, 2011, which he subjectively found to be offensive. However, these non-intimidating inquiries, despite their claimed, but yet non-specific frequency,[13] are far too innocuous to support a hostile work environment claim from an objective standpoint. *Cf. McCann v. Tillman*, 526 F.3d 1370, 1379 (11th Cir. 2008) ("Although offensive, such instances of racially derogatory language alone, extending over a period of more than two years, are too sporadic and isolated to establish that her employers' conduct was so objectively severe or pervasive as to alter the terms and conditions of her employment."); *id.* ("[A]lthough McCann alleges that she was upset by this language, she has not demonstrated that the alleged environment interfered with her job performance.") (emphasis added).

In sum, because of the mild nature of the specific retirement references that Mr. Berguson made to Mr. King for an approximate period of less than one year, a

---

[13] While Mr. King states in his affidavit that Mr. Berguson eventually made age-related comments to him every time they saw each other (Doc. 57-1 at 3 ¶ 13), he does not indicate how often Mr. Berguson came to the CVS store in Pell City, and he does not provide any exact or estimated reference to the overall number of such encounters that occurred.

reasonable jury could not conclude that continuously questioning Mr. King in such a non-serious, non-belittling manner whenever they saw each other, without more, was severe or abusive enough to alter the terms of Mr. King's employment and unreasonably interfere with Mr. King's ability to do his job.[14]

In his opposition, Mr. King additionally contends that "he was subjected to harassment in the form of unequal treatment and write-ups for trivial performance issues." (Doc. 56 at 67). Mr. King specifically states that was embarrassed and felt demeaned when Mr. Berguson investigated him for allegedly stealing two Pepsi drinks and called him a "liar," "thief" and "lazy." (*Id.*). Finally, Mr. King maintains that "a constant barrage of unjustified and petty criticisms of his work" and his disputed discharge  created a hostile work environment on the basis of his age. (*Id.*).

In relying upon this type of evidence that is not so obviously connected to his age, Mr. King offers no authority that such disciplinary actions and trivial criticisms by his supervisor are appropriately within the scope of Mr. King's hostile work environment claim and, accordingly, the court rejects this assertion as

---

[14] *Cf. EEOC v. Massey Yardley Chrysler Plymouth*, 117 F.3d 1244, 1247–48 and nn. 2 and 4 (11th Cir. 1997) (affirming jury finding of age-based hostile work environment and constructive discharge where supervisors (1) made offensive comments regarding effects of aging on plaintiff's body; (2) told her she was too old for the clothes she was wearing and should wear "old lady dresses" instead; (3) asked if she was "having any hot flashes;" (4) remarked that she was becoming "senile" or "losing it," and asked "whether Alzheimer's disease was setting in early;" (5) told her she would "just have to get used to" these comments since she "was, after all, 'an old lady'").

underdeveloped and unpersuasive. *See Flanigan's Enters., Inc. v. Fulton County, Ga.*, 242 F.3d 976, 987 n.16 (11th Cir. 2001) (holding that a party waives an argument if the party "fail[s] to elaborate or provide any citation of authority in support" of the argument); *Ordower v. Feldman*, 826 F.2d 1569, 1576 (7th Cir. 1987) (stating that an argument made without citation to authority is insufficient to raise an issue before the court); *cf. Hipp v. Liberty Nat. Life Ins. Co.*, 252 F.3d 1208, 1233 (11th Cir. 2001) ("ADEA does not guarantee employees a stress-free working environment.").

Further, even if Mr. Berguson reprimanded, investigated, scolded, and discharged Mr. King as a pretext for age discrimination, these actions, even when considered in conjunction with Mr. Berguson's retirement-related inquisition of Mr. King, simply are not the kind of severe and pervasive harassment which give rise to a separately cognizable hostile work environment claim. *See Mendoza*, 195 F.3d at 1244 ("We recognize that claims of employment discrimination . . . present fact-intensive issues. However, we agree with the Fifth Circuit's observation that motions for summary judgment or judgment as a matter of law are appropriate to 'police the baseline for hostile environment claims.'" (quoting *Indest v. Freeman Decorating, Inc.*, 164 F.3d 258, 264 n. 8 (5th Cir. 1999))). Therefore, CVS's Rule 56 Motion on Mr. King's hostile work environment claim is **GRANTED**.

### b.    Count Two for Retaliation

To establish a *prima facie* case of retaliation under the ADEA, a plaintiff must show:  (1) he engaged in a protected activity; (2) he suffered an adverse employment action, and (3) a causal connection between the two. *See, e.g.*, *Weeks v. Harden Mfg. Corp.*, 291 F.3d 1307, 1311 (11th Cir. 2002) ("It is well established in this circuit that to successfully allege a *prima facie* retaliation claim under either Title VII, the ADEA or the ADA, a plaintiff must show that (1) she engaged in statutorily protected expression; (2) she suffered an adverse employment action; and (3) the adverse action was causally related to the protected expression." (citing *Pipkins v. City of Temple Terrace*, 267 F.3d 1197, 1201 (11th Cir. 2001))).

To establish the causal connection prong, a plaintiff need only show that the protected activity and the adverse employment action "were not wholly unrelated." *Goldsmith v. City of Atmore*, 996 F.2d 1155, 1163 (11th Cir. 1993). However, "[t]he cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a *prima facie* case [of retaliation] uniformly hold that the temporal proximity must be 'very close[.]'" *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273, 121 S. Ct. 1508, 1511 (2001) (quoting *O'Neal v. Ferguson Constr. Co.*, 237 F.3d 1248, 1253 (10th Cir. 2001)).

24

As Mr. King summarizes the material facts in support of his retaliation claim:

King contacted the Human Resources Department of CVS in early August 2011 and reported that Berguson was discriminating against him and mistreating him because of his age. The Human Resources representative told King to contact Donna Yeatman, the District Manager. No one in Human Resources would discuss, nor investigate, his complaints. King then called Yeatman to report Berguson's discrimination. Yeatman was not in and King left a voice mail. When he did not hear from Yeatman he called her again on August 8, 2011, and left another message asking that she call me back about a very important matter. Yeatman did not return either call. On August 10, 2011, King called Yeatman's cell phone and left her another message. Yeatman finally returned his call on August 11, 2011, and arranged to have a telephone conversation with him on August 12, 2011.

On the morning of August 12, 2011, King spoke with Yeatman and told her how Berguson was mistreating King. King's complaints included the ongoing and continuing discriminatory treatment, the ageist remarks by Berguson, the unwarranted write-ups, and the negative comments about King's age and his plans for retirement. King further told Yeatman that Berguson was threatening to terminate him and causing King to be unfairly disciplined.

While Yeatman told King that she was going into a meeting with Berguson and would speak with him about his concerns, she expressed skepticism over King's complaints by stating, "that doesn't sound like something Cody would do." She promised to get back with King after she spoke with Berguson. Yeatman never responded to King's complaints nor did she call him concerning his complaints.

After hearing nothing from Yeatman after that meeting, King pursued other options within CVS to stop Berguson's unfair and discriminatory treatment.

King, who had never been given a handbook by CVS, reviewed the CVS employee handbook that he found online. He learned that employees could report claims of harassment and discrimination to their

supervisor or to the Human Resource Manager for their area.

King attempted to contact the Human Resource Managers for his area, Richard Howard and Walt Rogers, but learned that the telephone numbers listed for both men on the CVS intranet site were no longer valid numbers. King then called Rob Henderson, a Human Resource Manager located in Roswell, Georgia. Getting no answer he left a voice mail message but Henderson never returned his call. The CVS employee handbook also provided that an employee could report incidents of harassment through Ethics.BusinessConduct@cvs.com ("Ethics Hotline"). On September 2, 2011, King sent an e-mail to this address in which he summarized the ongoing harassment, discrimination and mistreatment he had experienced and the steps he had taken to report and stop the conduct without anyone at CVS responding.

On September 12, 2011, King received a phone call from a female representative of the Ethics Hotline advising him that his complaint had been received and an investigation would be forthcoming. To some degree King discussed his complaints with this representative. This precipitated an email from Jennifer DeAngela to Richard Howard outlining King's complaints of discrimination and harassment. On September 20, 2011, Berguson and Sandford came to the pharmacy where King worked, called him into the manager's office and suspended him. Two weeks later Defendants fired King.

(Doc. 56 at 62-64 (citations omitted)).

Thus, because his complaints about alleged mistreatment predate the filing of a charge of age discrimination with EEOC, Mr. King's ADEA retaliation claim is opposition-based as opposed to participation-based. *See Little v. United Technologies*, 103 F.3d 956, 960 (11th Cir. 1997) ("[A] plaintiff can establish a *prima facie* case of retaliation under the opposition clause of [the ADEA] if he shows that he had a good faith, reasonable belief that the employer was engaged in unlawful employment

practices.").

Assuming without deciding that Mr. King has met the *prima facie* test for ADEA retaliation, his claim nevertheless still fails because he is unable to demonstrate pretext. Mores specifically, unlike his ADEA discrimination claim in which he has adduced sufficient evidence by which a reasonable jury could conclude that Mr. Berguson harbored an age-related bias, there is no comparable proof of a potential <u>retaliatory</u> animus based upon any comments that Mr. Berguson made. *Cf. Reeves*, 530 U.S. at 148, 120 S. Ct. at 2109 ("Certainly there will be instances where, although the plaintiff has established a *prima facie* case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was [retaliatory].").

Alternatively, summary judgment is appropriate on Mr. King's ADEA retaliation claim because Mr. King has essentially abandoned the pretext issue. In particular, after devoting several pages of briefing to the *prima facie* part of his retaliation claim, Mr. King offers only two conclusory sentences and no case authority to substantiate his satisfaction of the pretext prong:

> A reasonable jury could conclude that Plaintiff's complaints aggravated Berguson and Yeatman and motivated their decision to suspend and terminate King. A jury could further conclude that Defendants' used King's alleged policy violation as a pretext to conceal their retaliatory motivation.

27

(Doc. 56 at 65).

This underdevelopment is significant because the court is not required to address any arguments that the parties have not fairly presented. *See, e.g.*, *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) ("There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment."); *Smith v. Secretary, Dept. of Corrections*, 572 F.3d 1327, 1352 (11th Cir. 2009) ("The district court did not consider that argument because it was not fairly presented."); *Smith*, 572 F.3d at 1352 ("Only one sentence in Smith's 116-page petition for a writ of habeas mentioned the possibility of inter-claim cumulative analysis and no authority was cited for it.") (emphasis added); *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for truffles buried in briefs.").

Therefore, for these independent reasons, summary judgment is **GRANTED** on Mr. King's ADEA retaliation claim.

### State Law Claims

#### c.      Count Six for Defamation

Mr. King's defamation count alleges that Defendants defamed him "by falsely accusing him of criminal acts and relaying these comments to other individuals within King's community." (Doc. 19 ¶ 120). As Mr. King testified during his deposition, the

alleged false statements relate to Mr. Berguson's communications that Mr. King had violated Alabama law with respect to his role in refilling a prescription for Lortab in September 2011 that had previously been filled by another CVS pharmacist, but given to the wrong customer. (*See, e.g.*, Doc. 53-1 at 31 at 338-39 ("That meeting  took about ten seconds, long enough for [Mr. Berguson, in the presence of CVS employee, Lindsey Armstrong ("Ms. Armstrong"),] to say you are hereby terminated for a violation of Alabama State law, and at that time I got up out of the chair and said I will see y'all in court and left.");[15] Doc. 53-1 at 36 at 357-58 ("Q. What defamatory things did Mr. Berguson . . . say or publish about you that you are claiming was defamatory in this case? A. That I broke the Alabama State Code."); Doc. 53-1 at 36 at 359 ("Q. And who - - who did [Mr. Berguson] say that within earshot of? A. Lindsey Armstrong and also the State Board.")).

A claim for defamation requires proof of the following elements:

1) a false *and* defamatory statement concerning the plaintiff; 2) an unprivileged communication of that statement to a third party; 3) fault amounting at least to negligence on the part of the defendant; and 4) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication of the statement.

*McCaig v. Talladega Pub. Co., Inc.*, 544 So. 2d 875, 877 (Ala. 1989) (emphasis in

---

[15]   The first set of page references to Doc. 53-1 corresponds with the court's CM/ECF numbering system and the second set corresponds with the deposition transcript page(s).

original) (citing *Restatement (2d) of Torts* § 558 (1977)). Further, "[t]ruth is an absolute defense to defamation . . . ." *Foley v. State Farm Fire and Cas. Ins. Co.*, 491 So. 2d 934, 937 (Ala. 1986) (citation omitted).

Here, Defendants contend that there many different reasons why they are entitled to summary judgment on Mr. King's defamation count. Concerning Mr. Berguson's communications made about Mr. King in the presence of CVS employee, Ms. Armstrong, during the discharge meeting, Defendants maintain that the element of publication is lacking and rely upon Alabama's so-called *McDaniel/Burney* rule:

> Thus, in a defamation case involving a corporate defendant, the first question must be "Was there a publication of the allegedly defamatory matter?" This question is answered by using the *McDaniel/Burney* test, which we most recently restated in *Dixon v. Economy Co.*, 477 So. 2d 353, 354 (Ala. 1985):
>
> > "Communications among the managerial personnel of a corporation about the company's business do not constitute a publication, under the rule of McDaniel v. Crescent Motors, Inc., 249 Ala. 330, 31 So.2d 343 (1947)."

*K-Mart Corp., Inc. v. Pendergrass*, 494 So. 2d 600, 603 (Ala. 1986).

In his opposition, Mr. King makes no effort to dispute the application of the *McDaniel/Burney* doctrine to these particular statements. Such an omission on the part of Mr. King constitutes an abandonment of his defamation claim tied to this evidence. *See, e.g.*, *Wilkerson v. Grinnell Corp.*, 270 F.3d 1314, 1322 (11th Cir. 2001) (finding claim abandoned when argument not presented in initial response to

30

motion for summary judgment); *Bute v. Schuller Int'l, Inc.,* 998 F. Supp. 1473, 1477
(N.D. Ga. 1998) (finding unaddressed claim abandoned); *see also Resolution Trust
Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) ("We decline to exercise
our discretion to entertain this argument which was not fairly presented to the district
court."); *Coal. for the Abolition of Marijuana Prohibition v. City of Atlanta*, 219 F.3d
1301, 1326 (11th Cir. 2000) (failure to brief and argue issue at the district court is
sufficient to find the issue has been abandoned); *Hudson v. Norfolk S. Ry. Co.,* 209
F. Supp. 2d 1301, 1324 (N.D. Ga. 2001) ("When a party fails to respond to an
argument or otherwise address a claim, the Court deems such argument or claim
abandoned."); *cf. Road Sprinkler Fitters Local Union No. 669 v. Indep. Sprinkler
Corp.,* 10 F.3d 1563, 1568 (11th Cir. 1994) (concluding that a district court "could
properly treat as abandoned a claim alleged in the complaint but not even raised as
a ground for summary judgment"); *McMaster v. United States,* 177 F.3d 936, 940-41
(11th Cir. 1999) (claim may be considered abandoned when district court is presented
with no argument concerning a claim included in the plaintiff's complaint).

However, the court reaches a different conclusion regarding Mr. King's
defamation claim connected to the communications made about him to the Alabama
Pharmacy Board. In urging summary judgment, Defendants maintain that absent from
the record is any evidence that Mr. Berguson was the person responsible for reporting

31

Mr. King and further that any communication by Mr. Berguson that Mr. King had violated state law was a true statement. (Doc. 47 at 57).

As to Defendants' first contention, Mr. King has shown significant discrepancies between Mr. Berguson's deposition testimony provided in the *Harris* action and this lawsuit (Doc. 56 at 27-28 ¶ 131) from which a reasonable jury could conclude that Mr. Berguson did report Mr. King to the Alabama Pharmacy Board for making an improper prescription refill in September 2011 prior to Mr. King's discharge in October 2011.

As for Defendants' second point, they have not met their burden of affirmatively showing that the defense of truth applies as a matter of law. In particular, the deposition testimony upon which Defendants rely is cited without any parenthetical explanations (Doc. 47 at 57), is woefully underdeveloped, and appears to include references to Mr. King's violations of Alabama Pharmacy Board regulations and CVS policy that predate the September 2011 refilling incident involving Mr. King.

As for the witness statement taken on September 20, 2011, the written question posed to Mr. King was cryptically worded in a compound format and does not establish an unambiguous admission by Mr. King:

> Q.   DOES THIS ACTION TAKEN COMPLY WITH CVS POLICY FOR ISSUES OF CONTROL DRUG LOSSES AND/OR

BOARD REGULATIONS TO THE BEST OF YOUR KNOWLEDGE OR WOULD YOU CONSIDER IT AN ATYPICAL RESOLUTION?

A.    NO

(Doc. 53-4 at 19).[16] Also, while Defendants' citations to Mr. King's deposition transcript confirm that he signed the statement, Mr. King does not testify that he violated Alabama law. Further, the record lacks a finding by the Alabama Pharmacy Board that Mr. King violated Alabama law with respect to the refilling incident. Accordingly, consistent with the foregoing analysis, summary judgment is **GRANTED IN PART** as to any defamation claims premised upon statements made during the termination meeting and otherwise is **DENIED**.[17]

### d.    Count Five for Libel and Slander

Mr. King's libel and slander count alleges that Defendants harmed him "by falsely accusing him of dishonest and criminal acts and relaying these comments to other individuals, including Plaintiff, co-workers, community, business contacts and

---

[16] All page references to Doc. 53-4 correspond with the court's CM/ECF numbering system.

[17] In their reply brief, Defendants contend, for the first time, that "CVS's actions in reporting the facts to the Board of Pharmacy and to the police department, regardless of who actually submitted the reports, are privileged and do not constitute defamation." (Doc. 60 at 36 (citing *Atkins Ford Sales, Inc. v. Royster*, 560 So.2d 197, 200 (Ala. 1990))). Raising such a defense in a reply brief is procedurally inappropriate, and this court is under no obligation to address the merits of this belatedly asserted privilege. *See, e.g., Benz, infra* (rejecting Defendants' justification defense raised in their reply brief only); *United States v. Georgia Dep't of Natural Resources*, 897 F. Supp. 1464, 1471 (N.D. Ga. 1995) ("This court will not consider arguments raised for the first time in a reply brief." (citing *United States v. Oakley*, 744 F.2d 1553, 1556 (11th Cir. 1984))).

the Board of Pharmacy." (Doc. 19 ¶ 115). "To sustain an action for slander, plaintiff must show that the 'alleged defamatory matter was published,' § 6-5-182, Ala. Code 1975, 'by proof of communication of the defamatory matter to someone other than himself.'" *Nelson v. Lapeyrouse Grain Corp.*, 534 So. 2d 1085, 1093 (Ala. 1988).

Neither Defendants nor Mr. King makes any effort to delineate between Mr. King's defamation count versus his libel and slander count in addressing them on summary judgment. Instead both sides have confusingly and unhelpfully lumped both their treatment of these counts together as "Defamation (Libel and Slander) Claims." (Doc. 47 at 56; Doc. 56 at 71).

In light of the parties' collective treatment of these counts, the court's defamation ruling above will apply equally to Mr. King's libel and slander count: summary judgment is **GRANTED** as to any allegedly slanderous statements made by Mr. Berguson in the presence of Ms. Armstrong during the discharge meeting with Mr. King on the basis of the *McDaniel/Burney* rule, but, except to that limited extent, summary judgment is **DENIED**.

### e. Count Seven for Negligent/Wanton Hiring, Training, Supervision, and Retention

Defendants maintain that Mr. King has no viable underlying wrongful act that will support his negligent/wanton hiring, training, supervision, and retention asserted

against CVS in Count Seven. (Doc. 47 at 60-64). Mr. King counters that Mr. Berguson's alleged wrongful conduct in violation of the AADEA can serve as an underlying legal basis to support such a claim. (Doc. 56 at 67-70).

Whether the Supreme Court of Alabama would agree with Mr. King's position appears to be an open question. Certainly, none of the cases cited by the parties deals with this AADEA issue directly.

Defendants do cite to *Thrasher v. Ivan Leonard Chevrolet, Inc.*, 195 F. Supp. 2d 1314 (N.D. Ala. 2002), which holds that a negligent supervision, retention, and training claim cannot be premised upon underlying sex discrimination. *See id.* at 1320 ("As Alabama does not recognize a common-law tort for sex discrimination in employment, the Court finds that Plaintiff cannot maintain an action for negligent supervision, training, and/or retention based upon conduct that is employment discrimination, but does not support a common-law tort.") (footnote omitted). However, *Thrasher* is not binding on this court and in any event is significantly distinguishable because, in sharp contrast to sex discrimination, Alabama <u>does</u> have a state statute which prohibits age discrimination.

In light of the court's decision to deny summary judgment on Mr. King's ADEA (and AADEA) discriminatory discharge claim and the legal uncertainty over whether the Supreme Court of Alabama would equate violations of the AADEA with

wrongful conduct appropriate to support a negligent/wanton training theory under Alabama law, summary judgment as to Count Seven is **DENIED** on that basis only. However, summary judgment is **GRANTED** as to any other possible grounds of wrongful conduct to support Count Seven either because Mr. King has abandoned those bases on summary judgment or because, as is the situation with Mr. King's AADEA hostile work environment and retaliation claims, the court has separately found that those claims are subject to dismissal on summary judgment.

### f.    Count Eight for Interference with Contractual or Business Relations

Mr. King asserts in Count Eight that:

> Defendants filed a complaint with the Pharmacy Board against Plaintiff and allowed public knowledge of this complaint to harm the Plaintiff's reputation in the community, even broadcasting untrue and criminal allegations and information about the complaint and Plaintiff and its status to other members of the community at large.

(Doc. 19 ¶ 133).

In 2009, the Supreme Court of Alabama reformulated the *prima facie* test for the tort of wrongful interference with a business relationship:

> Thus, properly stated, the elements of the tort are (1) the existence of a protectible business relationship; (2) of which the defendant knew; (3) to which the defendant was a stranger; (4) with which the defendant intentionally interfered; and (5) damage.

*White Sands Group, L.L.C. v. PRS II, LLC*, 32 So. 3d 5, 14 (Ala. 2009). Further, the

Supreme Court of Alabama clarified that "the absence of justification is no part of a plaintiff's *prima facie* case in proving wrongful interference with a business or contractual relationship[; instead,] [j]ustification is an affirmative defense to be pleaded and proved by the defendant." *White Sands*, 32 So. 3d at 12.

Concerning recoverable damages, the Supreme Court of Alabama summarized:

> In Alabama, one who wrongfully interferes with the business relationship of another is subject to liability for "(1) the pecuniary loss of the benefits of the ... relation; (2) consequential losses for which the interference is a legal cause; ... (3) emotional distress or actual harm to reputation if either is reasonably to be expected to result from the interference," *KW Plastics v. United States Can Co.*, 131 F. Supp. 2d 1265, 1268 (M.D. Ala. 2001); and (4) punitive damages. *Restatement (Second) of Torts* § 774A cmt. a (1979). White Sands need not "establish that 'but for' the interference [it] would have been awarded [a] contract." *Utah Foam*, 584 So. 2d at 1353. "The damage resulting from interference can occur regardless of the fact that the [plaintiff] would not have been awarded the contract, and it can also take other forms." *Id.*

*White Sands*, 32 So. 3d at 17.

In their initial brief, Defendants first maintain that they are entitled to summary judgment on this claim because Mr. King cannot show that Mr. Berguson ever contacted the Alabama Pharmacy Board. (Doc. 47 at 58). However, viewing the record in a light most favorable to Mr. King, which the court is required to do on summary judgment, the court disagrees with Defendants' position for the reasons stated in section IV.A.2.c. above.

Second, Defendants argue:

Here, it is undisputed that Berguson never took any unjustified action to interfere with King's licensing relationship with the Pharmacy Board and, since he has not had his license suspended or revoked, he cannot in good faith even allege (as he has throughout this case), must less prove, that he has been damaged under this claim theory. For each of the foregoing reasons, King's state law interference claim must be dismissed.

(Doc. 47 at 59). Thus, Defendants contend that, in absence of his pharmacy license being suspended or revoked, Mr. King has no cognizable damage to satisfy the tort's fifth *prima facie* element.

However, in suggesting summary judgment is appropriate for this damages-related reason, Defendants offer no supporting on-point authority. In particular, in neither their  opening brief (Doc. 47 at 58-59) nor their reply (Doc. 60 at 35) do Defendants address the issue of emotional damage or actual damage to Mr. King's reputation on account of Mr. Berguson's allegedly wrongfully interfering communications with the Alabama Pharmacy Board, which *White Sands* indicates are recoverable independent from other categories of relief.

In fact, in their reply, Defendants not only drop any further discussion of their damages-based challenge to Count Eight, but also perfunctorily assert for the first time an underdeveloped justification defense. (*See* Doc. 60 at 35 ("CVS's compliance with state and federal reporting requirements was justified and plaintiff's claim fails." (citing *Chapman v. Kelly*, 544 So. 2d 160, 161 (Ala. 1989)))). Defendants make no

effort to explain how *Chapman*, a case involving a bank's "right to select who does its title work[,]" 544 So. 2d at 161, persuasively means that Defendants' justification defense affirmatively applies here. Moreover, "[a]rguments raised for the first time in a reply brief are not properly before the reviewing court." *United States v. Benz*, 740 F.2d 903, 916 (11th Cir. 1984) (citing *Knighten v. Commissioner of Internal Revenue*, 702 F.2d 59, 60 (5th Cir. 1983)). Therefore, this court rejects Defendants' unpersuasive and belated attempt to assert a justification defense in reply on summary judgment. Accordingly, summary judgment on Count Eight is **DENIED**.

### g.    Count Nine for Invasion of Privacy

Mr. King alleges in Count Nine that "Defendants invaded the Plaintiff's personal and emotional sanctum by . . . falsely accusing and placing him in a false and unfavorable light and falsely accusing Plaintiff of violating the law of the State of Alabama and the state Pharmacy Board." (Doc. 19 ¶ 138).

As the Supreme Court of Alabama has summarized the scope of an action for invasion of privacy:

> Since 1948, beginning with the case of *Smith v. Doss*, 251 Ala. 250, 37 So. 2d 118 (1948), Alabama has recognized the tort of "invasion of the right to privacy." *See Liberty Loan Corporation of Gadsden v. Mizell*, 410 So. 2d 45 (Ala. 1982); *Hamilton v. South Central Bell Telephone Company*, 369 So. 2d 16 (Ala. 1979).
>
> It is generally accepted that the invasion of privacy tort consists of four distinct wrongs: 1) the intrusion upon the plaintiff's physical

39

solitude or seclusion; 2) publicity which violates the ordinary decencies; 3) <u>putting the plaintiff in a false, but not necessarily defamatory, position in the public eye</u>; and 4) the appropriation of some element of the plaintiff's personality for a commercial use. *Norris v. Moskin Stores, Inc.*, 272 Ala. 174, 132 So. 2d 321 (Ala. 1961), citing W. Prosser, *Law of Torts*, pp. 637-39 (2d ed. 1955).

*Phillips v. Smalley Maintenance Services, Inc.*, 435 So.2d 705, 708 (Ala. 1983) (footnote omitted) (emphasis added).

In moving for summary judgment, Defendants cite to Mr. King's deposition testimony and suggest that he is making an invasion of privacy claim based upon surveillance that was conducted at the Pell City CVS store and pharmacy where he worked. (Doc. 47 at 54). Nowhere do Defendants address the invasion of privacy claim that is tied to the report made to the Alabama Pharmacy Board about Mr. King that is procedurally before the court.

Mr. King does not expressly reject Defendants' characterization of his invasion of privacy claim in his opposition brief. Instead, Mr. King explains his invasion of privacy claim as follows:

> When King complained, CVS and Berguson retaliated and further subjected King to discriminatory treatment. King was placed in a false position in the public eye, CVS gave publicity to private information about King, and CVS intruded into King's physical solitude and seclusion by having King defend himself against false and defamatory accusations by Berguson and other CVS agents.

(Doc. 56 at 72).

Because Count Nine of Mr. King's complaint lacks any surveillance-based allegations, summary judgment on that type of invasion of privacy claim which is not procedurally before the court is appropriate. The Eleventh Circuit has made it unmistakably clear that "[a] plaintiff may not amend her complaint through argument in a brief opposing summary judgment." *Gilmour v. Gates, McDonald and Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004) (citing *Shanahan v. City of Chicago*, 82 F.3d 776, 781 (7th Cir. 1996)). *Gilmour* dealt with a plaintiff who was attempting to assert a new claim at the summary judgment stage. *Gilmour*, 382 F.3d at 1314-15.

Additionally, a more recent decision by the Eleventh Circuit cites to *Gilmour* and confirms that a district court's consideration of <u>any critical amendment</u> asserted merely as part of the briefing process is disfavored.

> The current practice in some district courts—especially in the summary judgment setting—is to ignore what the respective parties alleged in their complaint and answer and to consider their claims and defenses as depicted in the memoranda they filed in support of or in opposition to a motion for summary judgment. As is the situation here, the claims and defenses presented in the memoranda supporting or opposing summary judgment are not presented in the complaint and answer with the specificity required by the Federal Rules of Civil Procedure and the Supreme Court's decisions in *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009); rather, they are presented in a shorthand fashion. The result is that on appeal we have difficulty in determining whether the district court, in granting summary judgment, ruled on the claims and defenses as stated in the complaint and answer or as stated in the memoranda submitted to the court on summary judgment, as if the pleadings had

41

been amended by implied consent.

We encountered this dilemma most recently in *GeorgiaCarry.Org, Inc. v. Georgia*, 687 F.3d 1244 (11th Cir. 2012), *cert. denied*, ___ U.S. ___, 133 S. Ct. 856, 184 L. Ed.2 d 656 (2013). There, in their motion for summary judgment, the plaintiffs sought to eliminate a critical deficiency in the allegations of their amended complaint by including additional facts. The defendants did not object to this tactic on the ground that the plaintiffs were, in effect, seeking to amend their complaint. And the district court, in ruling on the sufficiency of the complaint, appeared to have considered the additional facts as if they had been alleged in the complaint. In affirming the district court's dismissal of the claim at issue, we refused to consider these additional facts, citing precedent that precludes a plaintiff from amending its complaint "through argument at the summary judgment phase of proceedings." *Id.* at 1258 n. 27. "At the summary judgment stage, the proper procedure for plaintiffs to assert a new claim is to amend the complaint in accordance with Fed. R. Civ. P. 15(a)." *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004).

This court's precedent foreclosed Well–Come's attempt to amend its complaint at the summary judgment stage without seeking leave of court pursuant to Rule 15(a)(2). Accordingly, the District Court should have disposed of Well–Come's claim with a statement that Well–Come failed to establish that ASRRG and ASIS issued a commercial general liability policy and excess/umbrella liability policy to Flintlock LLC, as alleged in paragraphs 6 and 7 of its complaint. We affirm the court's judgment on that ground. *Krutzig v. Pulte Home Corp.*, 602 F.3d 1231, 1234 (11th Cir. 2010) ("This court may affirm a decision of the district court on any ground supported by the record.").

*Flintlock Const. Servs., LLC v. Well-Come Holdings, LLC*, 710 F.3d 1221, 1227-28

(11th Cir. 2013) (emphasis added).

Thus, *Gilmour* and *Flintlock* procedurally foreclose Mr. King from belatedly

attempting to amend his complaint in any critical manner through his brief and/or

deposition testimony. Accordingly, summary judgment on Count Nine is **GRANTED** to the extent that Mr. King is attempting to assert a surveillance-based invasion of privacy claim. However, summary judgment is **DENIED** as to Mr. King's invasion of privacy claim tied to the communications made to the Alabama Pharmacy Board because Defendants have not adequately addressed the merits of that claim or otherwise carried their Rule 56 burden.

### h.    Count Ten for Intentional Infliction of Emotional Distress

Mr. King contends in Count Ten that Defendants' cumulative negative treatment of him constitutes cognizable intentional infliction of emotional distress. As Defendants correctly observe, the Supreme Court of Alabama has made it unequivocally clear that a claim for intentional infliction of emotional distress (or the tort of outrage as the claim is often alternatively called) "is a very limited cause of action that is available only in the most egregious circumstances." *Thomas v. BSE Indus. Contractors, Inc.*, 624 So. 2d 1041, 1044 (Ala. 1993). To present a jury question, a plaintiff must show sufficient proof:

> That the defendant's conduct (1) was intentional or reckless; (2) was extreme and outrageous; and (3) caused emotional distress so severe that no reasonable person could be expected to endure it. The Court defined the second element of the tort of outrage as follows: "By extreme we refer to conduct so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as

atrocious and utterly intolerable in a civilized society." *Inmon*, 394 So. 2d at 365 (quoting *Restatement (Second) of Torts*, § 46 cmt. d, at 72 (1948)).

*Thomas*, 624 So. 2d at 1043-44.

Moreover, to the extent that the Supreme Court of Alabama has found this type of claim to be appropriate in an employment-related lawsuit, such circumstances have been confined to situations involving egregious harassment. *See Henry v. Georgia-Pacific Corp.*, 730 So. 2d 119, 121 (Ala. 1998) ("Egregious sexual harassment can amount to the tort of outrage." (citing *Busby v. Truswal Systems Corp.*, 551 So.2d 322 (Ala. 1989))). As the Supreme Court explained the factual background in *Henry*:

> Dr. Deeble admitted that, during a later session, he asked Mrs. Henry if she was able to achieve an orgasm with her husband. While he hypnotized Mrs. Henry, Dr. Deeble told Mrs. Henry that she was "getting horny." Dr. Deeble acknowledged that, during one session, Mrs. Henry reported that she had an orgasm-like experience during the hypnosis. Dr. Deeble said he was unsure whether he told Mrs. Henry that he was "getting horny." He admitted that he told Mrs. Henry how to experience an orgasm by imagining sexual intercourse with her husband and how to "become more responsive overall in a sexual manner." Dr. Deeble said that he may have told Mrs. Henry that he had helped other employees with sexual problems.

*Henry*, 730 So. 2d at 120 (citations omitted). The plaintiff in *Henry* reported to her supervisor what had transpired with Dr. Deeble and was subsequently told "that she had to continue with the sessions or else lose her job." *Id.*

44

The Supreme Court of Alabama reversed the summary judgment ruling in favor of the defendant on the plaintiff's claim for outrage and reasoned:

> Viewing the facts in the light most favorable to Mrs. Henry, as we are required to do, we conclude that the summary judgment must be reversed. A jury could reasonably determine that Georgia–Pacific and Johnny Hurst's conduct was outrageous—that Johnny Hurst, working as a supervisor, was told exactly what had occurred during the sessions; that Georgia–Pacific, with prior knowledge, required Mrs. Henry to continue counseling sessions at which improper sexual conduct was occurring; and that they made Mrs. Henry's job dependent upon her attending those sessions.

*Henry*, 730 So. 2d at 121.

Here, the facts relied upon by Mr. King to show harassing behavior do not come anywhere close to the level of egregiousness met in *Henry*. Further, *Henry* is the <u>only</u> arguably on-point authority upon which Mr. King relies in opposing summary judgment on his outrage claim. (Doc. 56 at 70-72).

Finally, the court has separately found that Mr. King's proof consisting of constant questions by Mr. Berguson related to Mr. King's retirement does not create a triable issue under the comparable and, perhaps even less demanding, severe and pervasive standard applicable to federal hostile work environment/harassment claims. Accordingly, summary judgment is **GRANTED** in favor of CVS and Mr. Berguson on Count Ten of Mr. King's amended complaint.

### B.      Evidentiary Motions

#### 1.      Mr. King's Hardage Strike Motion

Because the court's rulings on summary judgment are unaffected by and appropriate regardless of the admissibility of the evidence challenged in the Hardage Strike Motion, it is **TERMED** as **MOOT**.

#### 2.      Defendants' King Strike Motion

The King Strike Motion is **DENIED IN PART** or otherwise **TERMED** as **MOOT IN PART**. More precisely, in raising specific objections to Mr. King's evidence offered in opposition to summary judgment, Defendants state in a footnote:

> For the sake of judicial economy, CVS will not re-type every paragraph of Plaintiff's Affidavits, as they already exist in the record at Doc. 57-1 and Doc. 57-3. CVS will highlight some demonstrative examples for the Court's consideration, but rests upon its assertion that paragraphs 8-19, 21-32, 34, 37, 40-47, 49-50, 52, 55-57, and 59-66 of the Original Affidavit, and paragraphs 2-9 and 11 of the Supplemental Affidavit, <u>each contain inadmissible evidence and should be stricken or otherwise disregarded by the Court</u>.

(Doc. 62 at 9 n.7 (emphasis added)). The court finds Defendants' lumping of their position into a vague umbrella statement that Mr. King's affidavits "contain inadmissible evidence" to be underdeveloped and unavailing. Therefore, to the extent that Defendants have not raised particularized evidentiary objections to portions of Mr. King's affidavits, their King Strike Motion is **DENIED**.

46

As for those parts of Mr. King's affidavits to which Defendants have asserted specific challenges (Doc. 62 at 9-16), because the court's rulings on summary judgment are unaffected by and appropriate regardless of the admissibility of this challenged evidence,  the remainder of the King Strike Motion is **TERMED** as **MOOT**.

### 3.    Defendants' Non-Party Strike Motion

The Non-Party Strike Motion is **DENIED IN PART** or otherwise **TERMED** as **MOOT IN PART**. The Non-Party Strike Motion objects to Mr. King's reliance upon the affidavit of Mr. Harris, the plaintiff in the *Harris* action, in opposing summary judgment. The primary portion of Mr. Harris's affidavit which is contested is paragraph 15:

> In the latter part of 2008, I believe around December 2008, I asked for a meeting with Donna Yeatman. In this meeting, I discussed with her several concerns and issues I had with Cody Berguson, including age-related comments he made including asking me how old I was, when I was going to retire and referring to me as "old man." Berguson would comment at the store in front of staff, "I see you all are working with the old man today" and "the old man is working today." I conveyed to Yeatman that the technicians that I supervised had picked up the comments from Berguson and began referring to me as "old man." I considered these comments disrespectful and I was embarrassed by them. I also told Yeatman that I had another job opportunity from Walgreen's. They were recruiting me and I had interviewed for the position of Pharmacist. I never had a meeting with Cody Berguson to discuss a job opportunity with Walgreen's that I had discussed with Yeatman and dispute the notes he made about a January 2009 meeting

47

where he indicates he told me I could resign and go ahead and take the job opportunity which is PX37. This never happened.

(Doc. 63 at 9).

In challenging this evidence, Defendants contend:

Aside from being totally irrelevant to this case and having no relation to Plaintiff's employment with CVS at a different store location and city, this paragraph contains several statements by Harris that constitute inadmissible hearsay. The paragraph also contains statements that are conclusory and factually unsupported in this case. Consequently, the affidavit (and paragraph 15 in particular) should be struck or disregarded by the Court in deciding CVS's Motion for Summary Judgment.

(Doc. 63 at 9).

The court concludes that with respect to those ageist comments that Mr. Harris

attributes to Mr. Berguson, Defendants' objections to the evidence are not well-taken.

Because these situations involve Mr. Berguson, the same relevant decision-maker in

Mr. King's case, such "me too" evidence is relevant as to pretext and admissible

consistent with the Eleventh Circuit's holding in *Goldsmith v. Bagby Elevator Co.,*

*Inc.*, 513 F.3d 1261 (11th Cir. 2008):

The "me too" evidence was admissible, under Rule 404(b), to prove the intent of Bagby Elevator to discriminate and retaliate. We have upheld the admission of coworker testimony in a sexual harassment context under Rule 404(b) to prove the defendant's "motive, ... intent, ... [or] plan" to discriminate against the plaintiff. Fed. R. Evid. 404(b); *Phillips v. Smalley Maint. Servs., Inc.*, 711 F.2d 1524, 1532 (11th Cir. 1983). Goldsmith and coworkers Jemison and Thomas were discriminated against by the same supervisor, Farley, so the experiences

48

of Jemison and Thomas are probative of Farley's intent to discriminate. Steber was involved in the termination decisions of all four individuals, so the experiences of Jemison, Peoples, and Thomas are probative of Steber's intent.

There was also evidence that was probative of the intent of Bagby Elevator to retaliate against any black employee who complained about racial slurs in the workplace. The evidence about Peoples, Thomas, and Jemison suggested that any black employee of Bagby Elevator who complained about racial discrimination was terminated. After Peoples filed her charge of discrimination with the EEOC, she was required to sign a promissory note on her employee salary advance, she was reprimanded for disabling automatic deductions from her paycheck, she was warned about having visitors at work, and she received a disproportionate amount of the payroll workload, none of which had ever happened before she filed her charge. Thomas was fired by Bowden for alleged reckless driving that Thomas denied, and Thomas testified that he was fired six weeks after his complaint about Farley's racial slur to Bowden and one week after Thomas had already submitted his resignation to Bowden.

*Goldsmith*, 513 F.3d at 1286 (emphasis added).

The court also rejects Defendants' suggestion that the introduction of "me too" evidence is limited and only appropriate under *Goldsmith* in pattern and practice cases. (Doc. 63 at 15 n.7). In fact, the Eleventh Circuit upheld the admissibility of such evidence in *Goldsmith* even though the pattern and practice claim asserted there ultimately did not go to the jury. *See Goldsmith*, 513 F.3d at 1291 ("Bagby Elevator suffered no prejudice when the district court allowed Goldsmith to amend his complaint because the district court later dismissed the claim added by the amendment.").

49

Further, *Phillips v. Smalley Maintenance Services, Inc.*, 711 F.2d 1524 (11th Cir. 1983), upon which *Goldsmith* expressly relies in support of its "me too" evidentiary ruling, makes no mention of pattern and practice claims. Finally, the cases cited by Defendants that have disregarded this type of discriminatory animus evidence are non-binding, and the court finds them to be unpersuasive and/or distinguishable.

Because the court's rulings on summary judgment are unaffected by and appropriate regardless of the admissibility of the other challenged evidence, the remainder of the Non-Party Strike Motion is **TERMED** as **MOOT**.

## V.   CONCLUSION

Accordingly, for the reasons stated above, CVS's Rule 56 Motion and Mr. Berguson's Rule 56 Motion are **GRANTED IN PART** and otherwise **DENIED**. More specifically, Counts Two, Three, Four, and Ten are **HEREBY DISMISSED WITH PREJUDICE**. The hostile work environment portion of Count One is **HEREBY DISMISSED WITH PREJUDICE**.

Those parts of Counts Five and Six that are tied to statements made during Mr. King's termination meeting are **HEREBY DISMISSED WITH PREJUDICE**, but otherwise these counts remain. Count Seven is **HEREBY DISMISSED WITH PREJUDICE** with the exception of the negligent training claim tried to Mr. King's

still viable discriminatory discharge claim under the AADEA.

Count Eight remains in the lawsuit. Count Nine is **HEREBY DISMISSED WITH PREJUDICE** to the extent that Mr. King is attempting to assert a store surveillance-based invasion of privacy claim, but otherwise the count remains.

Further, the Hardage Strike Motion is **TERMED** as **MOOT**, and the King Strike Motion and the Non-Party Strike Motion are both **DENIED IN PART** and **TERMED** as **MOOT IN PART**. Finally, by separate order the court will set this case for a final pretrial conference on those claims that remain in this lawsuit.

**DONE** and **ORDERED** this the 5th day of March, 2014.

**VIRGINIA EMERSON HOPKINS**
United States District Judge